E-FILED
Sunday, 10 October, 2021  06:08:07 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

| | | |
|---|---|---|
| MARIA E. CUPI, | ) | |
| Plaintiff, | ) | CASE NO.: 1:21-cv-01286 |
| | ) | |
| Vs. | ) | |
| CARLE BROMENN MEDICAL CENTER, | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

## **COMPLAINT**
### **and demand for jury trial.**

COMES NOW the Plaintiff, MARIA E. CUPI, by and through the undersigned attorney and files this complaint against the Defendant, CARLE BROMENN MEDICAL CENTER, and states as follows:

## **INTRODUCTION**

1.     This is an action for wrongful termination based on gender discrimination, wrongful termination based on disability discrimination, termination against public policy, and failure to pay wages.

## **PARTIES**

2.     Plaintiff, MARIA E. CUPI (hereinafter referred to as "Mrs. Cupi"), is a citizen of the State of Illinois who resides at 1414 Camden St., Pekin, IL 61554 and is a former employee of CARLE BROMENN MEDICAL CENTER in Normal, Illinois.

3.     Plaintiff is informed and believes, and thereon alleges, that Defendant, Carle BroMenn Medical Center, is a not-for-profit corporation in the State of Illinois and citizen of the

state of Illinois, which maintains its principal place of business at 1304 Franklin Ave., Normal, IL 61761.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law.

5.     This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share all common operative facts with her federal law claims, and the parties are identical. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

6.     Venue is proper in, and Defendants are subject to the personal jurisdiction of, this Court because Defendants maintain facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

7.     Pursuant to Local Rule CDIL-LR 40.1(A) of this District, assignment to the Peoria Division of this Court is proper because all or most of the events giving rise to Plaintiff's claims occurred in McLean County, Illinois.

## **ALLEGATIONS OF FACT**

8.     Mrs. Cupi was an employee of Carle Bromenn Medical Center (hereinafter referred to as the "hospital").

9.     Mrs. Cupi became an employee of Advocate BroMenn Medical Center in July 2019 and was promoted to Lead Officer in the department of Public Safety and Security in January 2020.

10.     The Carle Foundation, dba Carle Health, acquired Advocate BroMenn Medical Center in 2020 and changed its name to Carle Bromenn Medical Center.

11.     Mrs. Cupi's supervisor was John Avolio, the Security Manager, who is a male.

12.     Mr. Avolio supervised at least 20 other employees besides Mrs. Cupi, 17 of whom were male.

13.     Mr. Avolio would frequently call Mrs. Cupi "Farrah Fawcett", who is known to Mrs. Cupi and her co-workers as a 1980's sex symbol.

14.     Mr. Avolio would frequently brag about his younger years working at Palos Hospital and stated on numerous occasions, "All the nurses called me golden balls, because I was so fit, tan, and good looking."

15.     On or about on June 3, 2020, Matt Heaton, another Lead Supervisor, called Mrs. Cupi a "Little Bitch". Mrs. Cupi complained to her supervisor, John Avolio, about this, but to her knowledge, the incident was overlooked.

16.     On October 2, 2020, Mrs. Cupi was exposed to COVID-19 and called off work with a fever. She informed her Mr. Avolio of this and called the hospital's COVID hotline.

17.     The COVID hotline informed Mrs. Cupi that she could not work her scheduled shift that day and sent a confirmation email to her and Mr. Avolio stating that her job would be

protected under the hospital's COVID-19 policy. A true and correct copy of the message from the COVID hotline is attached hereto as Exhibit "1" and incorporated herein by reference.

18.     On October 3, 2020 Mrs. Cupi sought a COVID-19 test, which came back negative.

19.     On October 5, 2020, Mrs. Cupi received an email from the hospital's COVID hotline stating that she was cleared to return to her job duties.

20.     On her next day of work, October 6, 2020, Mr. Avolio requested, via email, that Mrs. Cupi come into work early to help move the mental health patients from the old Mental Health Unit to the new Mental Health Unit.

21.     Upon her early shift arrival to the hospital, Mr. Avolio called Mrs. Cupi's cell phone and asked her to come to his office. When she entered Mr. Avolio's office, he and Michelle Rush, a Human Resources Officer, were waiting.

22.     Mr. Avolio and Ms. Rush gave Mrs. Cupi a termination letter and told her that she violated the hospital's attendance policy. A true and correct copy of the termination letter is attached hereto as Exhibit "2" and incorporated herein by reference.

23.     The hospital terminated the employment of Mrs. Cupi, citing absenteeism including the absence on October 2, 2020 as an occurrence under the hospital's attendance policy.

24.     The hospital did not pay Mrs. Cupi wages for October 6, 2020 even though she had officially clocked into the hospital's employee time keeping system.

25.     Other male employees of the hospital in Mrs. Cupi's department have not been terminated for similar absenteeism situations.

26.     The hospital's attendance policy states, "Disciplinary action should not be taken without considering unique or mitigating circumstances, and examining the details of each employee's work record."

27.     One of the absence occurrences cited by the hospital took place on September 23, 2020 when Mrs. Cupi was on the way to the hospital for her 2p.m. shift and was delayed due to an overturned semi-tractor trailer tanker truck which was carrying hazardous liquids on Interstate 174. The interstate was blocked for several hours, while the Illinois State Police re-routed vehicles off the interstate.

28.     Mrs. Cupi made several phone calls to the hospital giving updates about her location and approximate time she anticipated arriving at the hospital. She clocked in at 3:03p.m.

29.     Local newspapers contained stories about the accident. A true and correct copy of a local news report of the incident is attached hereto as Exhibit "3" and incorporated herein by reference.

30.     Mrs. Cupi was not a probationary employee at the time of her termination.

31.     Mrs. Cupi received two performance evaluations while working at the hospital. Both evaluations were rated "exceeds expectations".

32.     Alex Anderson, a male, took over Mrs. Cupi's job duties after her termination.

33.     At least four male co-workers in Mrs. Cupi's department had over two attendance policy violation occurrences and maintained their employment at the hospital.

34.     At the time of her termination from the hospital, Mrs. Cupi was paid annual compensation in excess of $45,700.00. She also worked at least 200 hours of overtime the prior nine months and received about $6,500.00 of overtime compensation in addition to her salary.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

35.     Plaintiff timely filed charges with the Illinois Department of Human Rights ("IDHR"), which were cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").

36.     IDHR issued their NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS AND RIGHT TO COMMENCE AND ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND ORDER OF ADMINISTRATIVE CLOSURE (the "IDHR Right to Sue Notice") on July 15, 2021. A true and correct copy of the IDHR Right to Sue Notice is attached hereto as Exhibit "4" and incorporated herein by reference.

37.     EEOC issued their Notice of Right to Sue on September 24, 2021. A true and correct copy of the EEOC Notice of Right to Sue is attached hereto as Exhibit "5" and incorporated herein by reference.

38.     Plaintiff has timely filed this action and has complied with all administrative prerequisites to bring this lawsuit.

## COUNT I

(Wrongful Termination Based on Gender Discrimination)

39.     Plaintiff repeats and realleges paragraphs 8 through 34 as if fully set forth herein.

40.     It is an unlawful employment practice for an employer to discharge any individual because of such individual's sex under Title VII of the Civil Rights Act of 1964. 42 U.S. Code § 2000e–2

41.     Mrs. Cupi is a female and is a member of a protected class under Title VII because of her sex.

42.     Mrs. Cupi's performance evaluations indicate that she was exceeding the hospital's performance expectations.

43.     Mrs. Cupi suffered an adverse employment action when the hospital, and its agents and employees, terminated Mrs. Cupi's employment.

44.     The hospital cited the reason for Mrs. Cupi's termination was that she violated the hospital's attendance policy and documented three violation occurrences. Mrs. Cupi was treated less favorably than similarly-situated individuals who were not in her protected class, since four other male employees in the department remained employees with the same number or more occurrences.

45.     Mrs. Cupi's manager and other employees frequently used derogatory language directed at Mrs. Cupi's sex, demonstrating a clear discriminatory bias against Mrs. Cupi's protected class.

46.     As a direct, legal and proximate result of the discrimination, Plaintiff has sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial.

47.     Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on her sex.

WHEREFORE, Plaintiff prays for relief as set forth below.

## COUNT II

(Wrongful Termination Based on Disability Discrimination)

48.     Plaintiff repeats and realleges paragraphs 8 through 34 as if fully set forth herein.

49.     The Americans with Disabilities Act of 1990 (the "ADA") provides that no employer with 15 or more employees shall discriminate against a qualified individual on the basis of disability in regard to discharge of employees. 42 U.S.C. § 12112

50.     Mrs. Cupi had a fever, which is a symptom of COVID-19, on the day the hospital documented as her third attendance violation occurrence. This condition was a physical impairment and considered a disability under the ADA that substantially limited her strength and stamina.

51.     Employers, under the ADA, are required to make reasonable accommodations for employees based on their actual or perceived disability, and the hospital's own COVID hotline informed Mrs. Cupi that her job was protected because of this fever.

52.     The hospital terminated Mrs. Cupi on her very next workday citing as an attendance violation occurrence the day that Mrs. Cupi had a fever, and therefore the hospital did not make an accommodation for Mrs. Cupi's disability.

53.     As a direct, legal and proximate result of the discrimination, Plaintiff has sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial.

54.     Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on her disability.

WHEREFORE, Plaintiff prays for relief as set forth below.

## COUNT III

(Wrongful Discharge in Violation of Illinois Public Policy)

55.     Plaintiff repeats and realleges paragraphs 8 through 34 as if fully set forth herein.

56.     The Illinois Department of Public Health ("IDPH") issued guidance to employers

on August 3, 2020 that "Employers should not implement or keep in place any bonus or

incentive payments for work attendance that could encourage employees to work while sick." A

true and correct copy of the IDPH guidance is attached hereto as Exhibit "6" and incorporated

herein by reference. IDPH subsequently updated the guidance to include employers should not

implement or keep in place "any disciplinary programs that penalize employees for taking time

off."

57.     In light of the IDPH guidance, it is a violation of the Illinois public policy for an

employer to terminate an employee for taking time off work while ill during a pandemic.

58.     Mrs. Cupi had a fever, a COVID-19 symptom, on the day the hospital

documented as her third attendance violation occurrence.

59.     The hospital's own COVID hotline informed Mrs. Cupi that her job was protected

because of this fever.

60.     The hospital terminated Mrs. Cupi on her very next workday citing as an

attendance violation occurrence the day that Mrs. Cupi had a fever in violation of Illinois Public

Policy.

61.     As a direct, legal and proximate result of the discrimination, Plaintiff has

sustained economic and emotional injuries, resulting in damages in an amount to be proven at

trial.

62.     Defendants' unlawful actions were intentional, willful, malicious, and/or done

with reckless disregard to Plaintiff's right to be free from discrimination based on her disability.

WHEREFORE, Plaintiff prays for relief as set forth below.

## COUNT IV

(Failure to Pay Wages Under the Illinois Wage Payment and Collection Act)

63.     Plaintiff repeats and realleges paragraphs 8 through 34 as if fully set forth herein.

64.     It is a violation of the Illinois Wage Payment and Collection Act to not pay employees all wages that they are due under the Act. 820 ILCS 115 *et seq*

65.     The Defendant called Mrs. Cupi into work early on the day it terminated her employment and allowed her to clock into the hospital's time keeping system.

66.     The Defendant allowed Mrs. Cupi to start her shift, but did not pay her any wages for that day.

67.     As a direct, legal and proximate result of the discrimination, Plaintiff has sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial.

68.     Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right be paid fair wages.

WHEREFORE, Plaintiff prays for relief as set forth below.

## COUNT V

(Failure to Pay Wages Under the US Fair Labor Standards Act)

69.     Plaintiff repeats and realleges paragraphs 8 through 34 as if fully set forth herein.

70.     It is a violation of the US Fair Labor Standards Act to not pay employees all wages that they are due under the Act. 29 U.S.C. §§ 201-219

71.     The Defendant called Mrs. Cupi into work early on the day it terminated her employment and allowed her to clock into the hospital's time keeping system.

10

72.     The Defendant allowed Mrs. Cupi to start her shift, but did not pay her any wages for that day.

73.     Defendant willfully and intentionally refused to pay Plaintiff's wages as required by the Fair Labor Standards Act. Defendant remains owing Plaintiff these wages.

74.     Wherefore, the Plaintiff requests double damages and reasonable attorney fees from Defendant pursuant to the Fair Labor Standards Act as cited above, to be proven at the time of trial for all wages still owing from Plaintiff's entire employment period with Defendant or as much as allowed by the Fair Labor Standards Act along with court costs, interest, and any other relief that this Court finds reasonable under the circumstances.

## **JURY DEMAND**

75.     Plaintiff demands trial by jury on all counts of this complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for Judgment against Defendant as follows:

76.     For lost wages, penalties and all other compensation denied or lost to Plaintiff by reason of Defendants' unlawful actions, in an amount to be proven at trial;

77.     For compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

78.     For punitive damages in an amount sufficient to deter similar misconduct from the Defendant;

79.     For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

80.     For costs of suit incurred herein;

11

81.    For attorney's fees pursuant to 42 U.S.C. § 1988; and

82.    For whatever additional relief this Court deems just and equitable.

                        Respectfully submitted,

                        Maria E. Cupi

                        By: /s/ George W. Svoboda
                            Attorney for Plaintiff, Maria E. Cupi

                        George W. Svoboda
                        Atty #6220463
                        The Law Office of George W. Svoboda
                        37063 N Kimberwick Lane
                        Wadsworth, IL 60083
                        (224) 360-0696 – Phone
                        Email: george@georgesvobodalaw.com

**EXHIBIT "1"**

correspond with the sick bank/quarantine entry after the utilization of 24 hours of paid time off and/or unpaid time off is entered only if paid time does not exist. Sick bank/quarantine pay is a paid benefit in which benefit hours are only entered to bring an employee up to their regularly scheduled hours and will not be added in addition to worked hours that total the employees FTE status and/or regularly scheduled hours.

***Job Protection***
During this time while you are designated to be on self-quarantine by the COVID-19 hotline, your job will be protected. If after your self-quarantine

↩ ⌄ Reply to all

Please sign in to Maria .Cupi@advocatehealth.com …　SIGN IN

**EXHIBIT "2"**

## Notice of Termination

| | |
|---|---|
| **Employee Name:** Maria Cupi | **Date:** 10/06/2020    **Hire Date:** 7/22/2019 |
| **Employee ID Number: 115216** | **Department:   Security** |
| **Job Title:  Lead Officer** | **Manager's Name:  John Avolio** |

| Disciplinary History: | Level of Discipline | Date(s) | Subject |
|---|---|---|---|
| | Verbal Warning | | |
| | First Written Warning | | |
| | Final Written Warning | 8/27/2020 | Misconduct/Performance |

### Reason for Termination of Employment

**Provide details of the Offense:**
Maria Cupi's employment with Carle terminates effectively immediately for her violation of Carle Policy HR 601 – Attendance.  Since receiving her Final Written Warning, Maria Cupi has had the following occurrences of unscheduled absences:

- 9/3 Late, Scheduled 2pm, clock in 2:05pm          ½ occurrence
- 9/5 Late, scheduled 6pm, clock in 6:05pm          ½ occurrence
- 9/6 Late, scheduled 6pm, clock in 6:01pm          ½ occurrence
- 9/23 Late, scheduled 2pm, clock in 3:03pm         ½ occurrence
- 10/2 Called off with fever                        1 occurrence

These occurrences total three (3) occurrences of unscheduled absences in a thirty-day period.  Per policy HR601, two (2) occurrences of unscheduled absences within a thirty-day period will be considered excessive absenteeism and a violation of the Attendance Policy.

**As a result of the above stated reasons, and given that she has progressed through all the disciplinary steps, Maria Cupi's employment with Carle will be terminated, effective immediately.**

*I acknowledge that I have read and have been given the opportunity to comment on the above.*

_____                    _____
Employee Signature                                          Date

_____                    _____
Supervisor/Manager Signature                                Date

| **Employee Comments:  (Optional)** |
|---|
| |
| |
| |
| |

Please forward completed form to Human Resources, CATF1.

EXHIBIT "3"




NO DATA CAPS · METRONET
Stream, game, browse as much as you want at NO extra charge!



# Driver cited after semi overturns on I-74; lanes closed for extended period

 **September 23, 2020**  11:45 am

25 News

NEWS, TOP STORIES

    

UPDATE 9:00 P.M. -- Interstate 74 has been reopened between Goodfield and Carlock, and the crash scene has been cleared.


ORDER YOUR Holiday Meal BY NOVEMBER 24. Order now · WHOLE FOODS MARKET

**EXHIBIT "4"**

**STATE OF ILLINOIS**
**DEPARTMENT OF HUMAN RIGHTS**

**IN THE MATTER OF:**

MARIA E. CUPI,                                    )
                                                  )
                                                  )
                COMPLAINANT,    )    CHARGE NO.        2021SF1501
AND                                               )    EEOC NO.          21BA10716
                                                  )
CARLE BROMENN MEDICAL CENTER,   )
                                                  )
                                                  )
                                                  )
                                                  )
                RESPONDENT.      )

## NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND ORDER OF ADMINISTRATIVE CLOSURE

For Complainant                          For Respondent

George W. Svoboda                        Chief Executive Officer
The Law Office of                        Carle Bromenn Medical Center
George W. Svoboda                        1304 Franklin Avenue
37063 N. Kimberwick Lane                 Normal, IL 61761
Wadsworth, IL 60083

**Date Perfected Charge Filed:** Apr 26, 2021          **Date Opt Out Request Filed:** Jun 23, 2021

YOU ARE HEREBY NOTIFIED that pursuant to Section 7A-102(C-1) of the Illinois Human Rights Act (775 ILCS 5/7A-102(C-1)), Complainant having filed a written request to opt out of the Illinois Department of Human Rights' investigation and administrative processing of the above-captioned charge, the IDHR issues this Notice of Opt Out of the Investigative and Administrative Process, and the Right of Complainant to Commence an Action in the Circuit Court or other appropriate court of competent jurisdiction within 95 days from the date of this Notice and Order, as identified above.

- Complaint filed and serve a copy of the complaint to the Department and Respondent on the same date that the complaint is filed with the circuit court or other appropriate court of competent jurisdiction.
- Complainant may not file or refile a substantially similar charge with the Department arising from the same incident of unlawful discrimination or harassment.

NOW, THEREFORE, it is further hereby ORDERED that the Department cease the investigation and administratively close the charge of civil rights violation(s).

ENTERED ON  July 15, 2021

DEPARTMENT OF HUMAN RIGHTS

BY: _____
        Brent A. Harzman, Manager
        Charge Processing Division

Notice of Opt Out. Right & Order Adm.
Closure D/P 01/01/2020
Rev. 03/06/2020

EEOC Form 161-B (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## EXHIBIT "5"

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| | |
|---|---|
| To:  **Maria E. Cupi**<br>**c/o George W. Svoboda, Esq.**<br>**The Law Office of George W. Svoboda**<br>**37063 N. Kimberwick Lane**<br>**Wadsworth, IL  60083** | From:  **Chicago District Office**<br>**230 S. Dearborn**<br>**Suite 1866**<br>**Chicago, IL 60604** |

☐   *On behalf of person(s) aggrieved whose identity is*
   *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **21B-2021-00716** | **Daniel Lim,**<br>**State & Local Coordinator** | **(312) 872-9669** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

[X]   More than 180 days have passed since the filing of this charge.

[ ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]   The EEOC is terminating its processing of this charge.

[ ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

[ ]   The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]   The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Julianne Bowman*/jwa                                                9/24/2021

Enclosures(s)

**Julianne Bowman,**                                           *(Date Issued)*
**District Director**

cc:

**CARLE BROMENN MEDICAL CENTER**
**c/o Chief Executive Officer**
**1304 Franklin Ave**
**Normal, IL 61761**

 **State of Illinois**   

**EXHIBIT "6"**

**August 3, 2020**

## GUIDANCE FOR EMPLOYERS AND EMPLOYEES
## ON WORKERS' RIGHTS AND SAFETY

Federal and Illinois law require employers to maintain a safe and healthy workplace. As we continue in Phase 4 of the Restore Illinois plan and more Illinoisans go back to work, employers and employees are navigating difficult questions around how to maintain a safe and healthy workplace during the COVID-19 pandemic. COVID-19 has also raised a variety of other employment-related questions around issues such as pay and benefits, leave, and eligibility for unemployment insurance.

This guidance is intended to help both employers and employees educate themselves about minimum required workplace safety requirements, best practices to promote a safe and well-functioning workplace during the COVID-19 pandemic, and to answer some frequently asked questions around COVID-19 and the workplace.

### A. Minimum Workplace Safety Requirements During Phase 4

Employers are required to follow the Governor's Executive Orders, including those workplace safety measures outlined in the Restore Illinois plan and guidelines from the Illinois Department of Public Health and Illinois Department of Commerce and Economic Opportunity. The Executive Orders require employers to:

- continue to evaluate which employees are able to work from home, and are encouraged to facilitate remote work when possible;

- ensure that employees practice social distancing and wear face coverings when social distancing is not possible; employers in retail, manufacturing, and office settings must provide face coverings to all employees who are not able to maintain a minimum six-foot social distance at all times;

- ensure that all spaces where employees may gather, including locker rooms and lunchrooms, allow for social distancing;

- ensure that all visitors (customers, vendors, etc.) to the workplace can practice social distancing; but if maintaining a six-foot social distance will not be possible at all times, urge visitors to wear face coverings; and

- prominently post the guidance from the Illinois Department of Public Health (IDPH) and Office of the Illinois Attorney General regarding workplace safety during the COVID-19 emergency.

### B. Anti-Discrimination and Anti-Retaliation Laws Applied to COVID-19

State and federal law protect employees from retaliation for raising safety and health concerns with the employer or with their coworkers. State and federal law require employers to maintain a workplace free of harassment or discrimination regardless of age, disability, sex, race, national origin, religion, or any other protected category.

#### 1. Protections from Retaliation

a. Employers are prohibited from retaliating against an employee for raising concerns about COVID-19 or their overall safety and health concerns internally or to a government agency. Employers are further prohibited from retaliating against an employee when they disclose information that they have reasonable cause to believe is a violation of a state or federal law, rule, or regulation. Specific federal, state, and local protections against retaliation include:

i. The federal Occupational Safety and Health Act of 1970 protects private sector employees who raise safety and health concerns with their employer or a government agency. Employees who believe they have been retaliated against may file a complaint with the federal Occupational Safety and Health Agency (OSHA). (Note that employees generally only have 30 days to file a complaint.)

ii. The Illinois Occupational Safety and Health Act of 2015 protects state and local government employees who raise safety and health concerns with their employer or a government agency. Public employees believe that they have been retaliated against may file a complaint with the Illinois Occupational Safety and Health Agency (IL OSHA).

iii. The Illinois Whistleblower Protection Act, 740 ILCS 174, prohibits retaliation against an employee for disclosing information that they believe violates a state or federal law, rule, or regulation.

iv. The City of Chicago prohibits retaliation, including termination, against employees who work within the City for obeying a stay-at-home, quarantine, or self-isolation order. M.C.C.1-24. Chicago-based employees may file a complaint with the City's Office of Labor Standards if they believe that they have been retaliated against in violation of this ordinance.

b. Section 7 of the National Labor Relations Act (NLRA) protects employees' ability to engage in "protected concerted activity for mutual aid or protection" in both union and non-union settings. Such protected concerted activity generally includes employees talking to one another about working conditions or workplace safety, or engaging in actions, such as petitions or walkouts, to try to improve safety conditions.

**2. Non-discrimination**

a. All workplace safety policies, including required face coverings, must be applied and enforced equally for all employees in the workplace, except for those employees who have informed the employer that they have a medical reason or disability that prevents them from wearing a face covering. Further guidance concerning the use of face coverings is available here.

b. Employers may not require employees to disclose if they are at higher risk or have a health condition. However, if possible, they must try to make reasonable accommodations for an employee who requests an accommodation. Further guidance regarding the Americans with Disabilities Act and the COVID-19 pandemic is available here.

c. If an employee tests positive for COVID-19, their employer should inform other employees in the workplace who may have been exposed. The employer may not disclose the name of individual employee(s) who test positive.

d. Employers may require an employee to take a COVID-19 test or submit a medical verification clearing them to return to work after they have tested positive for COVID-19, been sick, or experiencing COVID-19 related symptoms.

e. Per guidance from the Equal Employment Opportunity Commission (EEOC), employers *may not* require a COVID-19 antibody test before allowing employees to return to work.

## C. Best Practices to Promote Workplace Health and Safety

The following measures are not legal requirements but are steps that employers are encouraged to consider to promote a healthy work environment and limit the spread of COVID-19.

**1. Employee Scheduling**

a. If it is not feasible for employees to work from home, employers should consider what arrangements can be made to limit the number of workers that are together in the workplace at any one time. For example, employers should consider staggering shifts or designating groups of workers to consistently work on particular days and times.

b.  To promote scheduling consistency, employers may give employees the opportunity to provide input on their preferred schedule.

**2.  Workplace Safety Plans**

a.  Employers may develop a workplace safety plan as a way of identifying and addressing risks.

b.  Workers are an integral part of an effective workplace safety plan as they are often in the best position to identify hazards in a particular area or job. To promote worker input and feedback on safety and health matters, employers should consider designating one or more employees to be points of points of contact for employees with health or safety concerns or, in larger workplaces, creating a workplace safety and health committee made up of  worker representatives from a variety of roles within the business

c.  In workplaces where employees are represented by a union, union representatives can also participate in workplace safety planning.

**3.  Illness Prevention**

a.  Employers will want to ensure that all workers who perform work on-site, including temporary employees and independent contractors, receive workplace safety training that includes training on COVID-19 symptoms and how to self-assess for symptoms.

b.  Worker safety training and the corresponding written materials should be available in a language spoken by employees and accessible to employees with a range of education levels.

c.  In order to promote their use, employers should make face coverings and other protective equipment available at no charge to employees in order to promote their use.

d.  Employees should be instructed to stay home when sick and to follow the guidance of public health authorities if they have been exposed to someone with COVID-19.

e.  Employers should not implement or keep in place any bonus or incentive payments for work attendance that could encourage employees to work while sick.

f.  Employers should clearly explain all paid leave policies and make workers aware that they may be eligible for benefits if they are sick or symptomatic.

[1]For purposes of this guidance document, the term "workers" should be understood to include not only an employer's employees, but also any temporary laborers as defined by the Illinois Day and Temporary Labor Services Act, 820 ILCS 175/5, independent contractors, or other individuals that perform work at the work site.

# FREQUENTLY ASKED QUESTIONS FOR EMPLOYERS AND EMPLOYEES

## Questions Related to Health and Safety in the Workplace

1. **Can an employer require an employee to go home if the employee is exhibiting COVID-19 symptoms?**
   Yes, employees who exhibit symptoms of COVID-19 can be asked to leave the workplace and stay at home until they are free of symptoms.

2. **Can an employer require employees to wear masks at work?**
   Yes, an employer can require employees to use protective gear, including masks or face coverings. Workers who have a medical condition or disability that prevents them from safety wearing a face covering may seek a reasonable accommodation from these requirements. More information on the use of face coverings is available here.

3. **Can employers implement temperature screenings?**
   Yes, the EEOC has issued guidance stating that due to the acknowledgment of COVID-19 community spread by the Centers for Disease Control and Prevention (CDC) and state/local health authorities, employers may take employees' temperatures. As with other medical information, employers must maintain the confidentiality of employee temperatures and any other symptoms.

4. **If an employee has been quarantined at home, may their employer require that they get a doctor's note or a COVID-19 test before returning to work?**
   Yes, employers are responsible for maintaining a safe and healthy workplace and there is nothing in Illinois or federal law that prohibits an employer from requiring a doctor's note or COVID-19 test before an employee returns to work. Healthcare providers must make COVID-19 diagnostic testing available for free to individuals regardless of insurance or immigration status. Employers should recognize that healthcare providers may be extremely busy and not able to provide the requested documentation in a timely manner.

5. **How much information can an employer request from an employee who calls in sick?**
   Employers have an obligation to ensure a healthy workplace. During the COVID-19 pandemic, employers may ask employees if they are experiencing symptoms of COVID-19, including fever, chills, cough, and shortness of breath. However, employers are required to ensure the confidentiality of any medical information provided by an employee.

6. **Are employees who have COVID-19 or are experiencing COVID-19 symptoms entitled to paid time off? What about employees who recommended to self-quarantine by a doctor or employer due to potential exposure? What about employees who need to take time off to care for a family member for reasons related to COVID-19?**
   Employees in all of these situations may be entitled to paid time off under their employer's existing leave program as well as under the federal Families First Coronavirus Response Act ("FFCRA"), public law 116-127. The Attorney General's Office has issued more detailed guidance on the FFCRA and paid sick leave.

7. **What should an employer do if an employee reports COVID-19 symptoms or tests positive for COVID-19?**
   If an employee reports having any COVID-19 related symptoms, the employer should encourage the employee to contact their health care provider.  If two or more employees report having any COVID-19 related symptoms or test positive for COVID-19, the employer should notify their local health department within 24 hours of being informed of the presence of COVID-19 symptoms or positive test results. The employer should also notify any employees who have been or may have been exposed, although they should keep the name of the employee confidential.

   Employers should never require employees or other workers at the workplace to report to work while experiencing COVID-19 symptoms.

8. **What should an employee do if they test positive for COVID-19?**
   An employee who tests positive should make their employer aware of the positive test. Employees should not come to work, nor should their employer require them to come to work, if they have had a positive test or are experiencing COVID-19 symptoms.

9. **Can an employee refuse to go to work if they feel at risk for contracting COVID-19?**
   There is currently no state or federal law that provides job protection to a healthy employee who refuses to work out of fear of contracting COVID-19. However, employees may be entitled to use vacation or other paid time off in accordance with their employer's established leave program. Under the federal Occupation Safety and Health Act of 1970, employees who believe that they are in imminent danger may refuse to work if certain conditions are met.

   Employees who are at higher risk, live with individuals at higher medical risk, or are pregnant can request a reasonable accommodation. It is the employer's responsibility to then consider accommodations, such as allowing that employee to work from home, moving their workstation to a less crowded area, or re-examining job duties to minimize interaction with other coworkers or members of the public. The Americans with Disabilities Act, 42 U.S.C. § 12112, prohibits employers from requiring employees to disclose if they have a medical condition or are at higher risk, so employees must volunteer this information in order to seek an accommodation.

10. **Can an employer require employees or workers at a job site to sign a non-disclosure agreement or other contract agreeing not to disclose information about health and safety in the workplace?**
    No. Such an agreement or contract would violate public policy expressed public health and occupational safety laws and would not be enforceable against the employee.

11. **Can an employee be fired or retaliated against for raising safety concerns at work or making a complaint regarding workplace safety to a government agency?**
    No, various provisions of federal and state law prohibit retaliation against employees for raising safety and health concerns. Employees who believe that they have been retaliated against may consider consulting with an attorney.

12. **What can an employee do if they are concerned about multiple COVID-19 positive tests or symptomatic employees in the workplace?**
    Employees can contact their local department of health or the Illinois Department of Public Health at 1-800-889-3931 by emailing DPH.SICK@ILLINOIS.GOV.

13. **Do health and safety laws and rules protect immigrant workers?**
    Yes, health and safety laws apply to all employees, regardless of immigration status.

*Additional resources and frequently asked questions about COVID-19 and public health are available here or at* https://www.dph.illinois.gov/covid19*. Additional guidance includes:*

*Industry Specific Guidance:*

- *Migrant labor camp guidance:* https://www.dph.illinois.gov/covid19/community-guidance/migrant-labor-camp-guidance

- *Meat and Food Processing guidance:* http://dph.illinois.gov/covid19/community-guidance/guidance-food-and-meat-processing-facilities

*Sick Leave Guidance:*

- https://illinoisattorneygeneral.gov/rights/WRB_Paid_Sick_Leave_FAQ.pdf
- https://www.cookcountyil.gov/service/earned-sick-leave-ordinance-0

## Questions Related to Wage and Benefit Issues

**14. Can an employee be laid off or fired because of the economic impact of COVID-19 on an employer's business?**

Yes, generally an employer can lay off or terminate an employee for economic reasons.  Exceptions to this general rule are (i) employees who are guaranteed employment for a certain period of time under an employment contract, or (ii) employees performing work under a collective bargaining agreement that provides for procedures around employee layoffs and terminations.

**15. Are laid off or terminated employees entitled to earned wages? Vacation pay?**

Yes. The Illinois Wage Payment and Collection Act requires that, after separation from employment, employees must be paid all final compensation including bonus payments, vacation pay, wages and commissions on their next regularly scheduled payday. 820 ILCS 115/5. More information on unpaid wages and the wage claim process is available here.

**16. Are undocumented employees entitled to earned but unpaid wages?**

All workers are entitled to their promised wages for all hours of work performed, regardless of immigration status.

**17. Are employees on unpaid leave entitled to health insurance?**

If an employee is receiving health insurance through their employer, the employer must continue that coverage during the leave period.

**18. How can an employee who has been laid off access health insurance?**

Laid off employees who previously had employer-provided health insurance may continue their coverage under the Consolidated Omnibus Budget Reconciliation Act (COBRA). Additionally, employees can choose to enroll in coverage provided through the Affordable Care Act.

***Additional frequently asked questions about COVID-19 and wages, benefits, and lay-offs are available here. For further information or to contact the Illinois Department of Labor visit:*** https://www2.illinois.gov/idol/Pages/contact.aspx

## Questions Related to Unemployment Insurance

**19. Can an employee collect unemployment insurance if they are temporarily laid off due to COVID-19 related work closures?**

An individual temporarily laid off in this situation can qualify for benefits if the individual is available for and actively seeking work. The individual qualifies as actively seeking work as long as they are prepared to return to their job as soon the employer reopens.

**20. Can an employee collect unemployment insurance if they refuse to return to work because of concerns about COVID-19?**

Individuals who refuse an offer of suitable work are disqualified from receiving unemployment insurance unless there is good cause for the refusal. The determination of whether work is suitable and whether there is good cause for refusing it is made on a case-by-case basis through the Department of Employment Security's hearing and adjudication process.

**21. Can individuals get unemployment insurance at the same time as paid leave?**

Under certain circumstances, individuals who are currently receiving paid leave are not eligible for unemployment insurance. In applying for benefits, a claimant must report any paid leave to which they are entitled.

**22. Can workers who are temporary employees through a temporary staffing agency receive unemployment insurance?**

Yes, temporary employees through a temporary staffing agency can be eligible for unemployment insurance.

**23. How long does unemployment insurance last?**

Eligible employees can receive up to 26 weeks' worth of regular state unemployment insurance and, depending on the unemployment rate, Extended Benefits may be available for an additional 13 or 20 weeks' worth. Federal Pandemic Emergency Unemployment Compensation (PEUC) is a temporary program that provides up to 13 additional weeks' worth of benefits to individuals who have exhausted all rights to regular unemployment insurance compensation with respect to a benefit year that ended on or after July 1, 2019. Pandemic Unemployment Assistance is available for up to 39 weeks for individuals whose unemployment is attributable to COVID-19 and who are not eligible for other unemployment benefits.

**24. What assistance is available for freelancers, self-employed individuals, and independent contractors who have lost work as a result of the COVID-19 pandemic?**

Pandemic Unemployment Assistance (PUA) was created to help self-employed individuals, freelancers, and independent contractors who lose work as a result of specific reasons set forth in federal law attributable to the COVID-19 pandemic and are not eligible for regular unemployment insurance. A precondition for PUA approval is that someone is not eligible for any other unemployment programs. Applying for and being denied benefits under the regular unemployment insurance program is the first step in establishing eligibility under PUA.

**25. I receive a Form 1099 for the job(s) I do as an independent contractor. Am I eligible for PUA?**

If you are a worker who received a Form 1099 and are not certain if you are eligible for PUA, you should file a claim for regular unemployment benefits for two reasons. First, not all individuals classified as "1099 employees" are actually "independent contractors" as defined by the Unemployment Insurance Act. Some of these individuals should have been classified as employees and therefore would be eligible for unemployment insurance. An employer's failure to contribute to the unemployment system will not impact an individual claimant's eligibility for benefits. Second, the PUA program has been established for individuals who are unemployed for specific reasons attributable to COVID-19 and not covered by the state's regular unemployment insurance program. To establish eligibility under the new program, the claimant will have to demonstrate that they are not eligible under the regular program. Applying for and being denied benefits under the regular program is the first step in establishing eligibility under the new temporary program.

**26. How long will Pandemic Unemployment Assistance last? Will my PUA claim be backdated?**

PUA payments are available for claimants who lost work due to specific COVID-19 related reasons provided for in the federal law, beginning the week of February 2, 2020. PUA payments end on December 26, 2020. IDES will backdate claims to the first week of unemployment due to the COVID-19 related reason.

**27. I am undocumented and lost my job because of COVID-19. Am I eligible for unemployment benefits?**

In general, individuals who are not authorized to work in the United States are not eligible for regular unemployment benefits or benefits under the PUA. Among other things, they are not considered "able and available to work" under unemployment insurance law.

**28. I have a Green Card and was recently laid-off due to COVID-19. Am I eligible for unemployment benefits?**

Individuals with Green Cards issued by the federal government are generally "able and available to work" and may be eligible for unemployment benefits.

***Additional frequently asked questions about COVID-19 and unemployment insurance are available*** here***. For further information or to contact the Illinois Department of Employment Security please visit:*** https://www2. illinois.gov/ides/aboutides/Pages/Contact_IDES.aspx***. Please note that this document does not change the requirements to be eligible for unemployment benefits.***



*Questions about COVID-19?*
*Call 1-800-889-3931 or email dph.sick@illinois.gov*
*Illinois Department of Public Health - www.dph.illinois.gov*

Printed by Authority of the State of Illinois • 8/3/20     IOCI 21-58